### GILSON v. F. S. ROYSTER GUANO CO.

(Circuit Court of Appeals, Third Circuit. July 22, 1924.)

No. 3107.

**1. Brokers ⬤⟳96—Payment to broker on contract to buy garbage tankage held payment to seller.**

Under contract to buy garbage tankage, payment to be made on arrival and after chemical analysis, buyer's initial payment to a broker on receipt of invoice and chemical analysis from the broker, no invoice ever being received from seller, whose president testified to a trade custom authorizing payment to broker, *held* payment to seller.

**2. Trial ⬤⟳419—No reversal for failure to direct nonsuit, where subsequent testimony presents case for jury.**

Mere failure to direct nonsuit for lack of proof in plaintiff's case is not ground for reversing judgment against defendant, if testimony admitted thereafter presents a case for the jury.

**3. Sales ⬤⟳418(7)—Seller's offer to supply goods, after failure to deliver as contracted, held not such that buyer was bound to accept, to mitigate loss.**

Where seller on credit refused to deliver goods contracted for, because buyer failed to make the initial payment, which he had in fact made, seller's offer to continue shipments at the regular price, provided the buyer made the initial payment and made advance payments, was not such offer as buyer was bound to accept to mitigate damages.

**4. Sales ⬤⟳418(7)—Buyer's duty to buy other goods to mitigate loss after seller's breach stated.**

Where the seller refuses to deliver goods contracted for, the buyer must do all that he reasonably can to mitigate the loss, either by supplying himself with like goods at place of delivery, or other available market, at time of breach, for price not exceeding contract price, even if he has to buy from the seller.

**5. Sales ⬤⟳418(7)—Buyer bound to accept seller's offer to mitigate damages only if unconditional.**

Where seller fails to deliver goods contracted for, but offers to make further deliveries at a price not exceeding the contract price, the buyer is only bound to accept to avoid enhancing damages, if the offer is unconditional and involves no waiver of the breach.

**6. Sales ⬤⟳418(2)—Measure of damages for breach of contract to sell garbage tankage stated.**

Measure of damages for failure to deliver garbage tankage contracted for was difference between contract and market price at place of delivery and time of breach.

**7. Sales ⟨⟩417—Testimony held sufficient to show market price of garbage tankage.**

In action for failure to deliver garbage tankage sold for price varying with ingredients, testimony *held* sufficient to show market price at place of delivery and time of breach.

In Error to the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Action by the F. S. Royster Guano Company against Herbert Clerk Gilson, receiver of the Farmers' Supply & Products Company, and another. Judgment for plaintiff, and the named defendant brings error. Affirmed.

Walter Hanstein and Thompson & Hanstein, all of Atlantic City, N. J., for plaintiff in error.

Carlyle Garrison, of Jersey City, N. J., for defendant in error.

Before WOOLLEY, Circuit Judge, and SCHOONMAKER and McKEEHAN, District Judges.

McKEEHAN, District Judge. The F. S. Royster Guano Company recovered a judgment in the court below for $37,318.83, against the Farmers' Supply & Product Company, as damages for the defendant's breach of a contract to sell the plaintiff its entire production of garbage tankage. The defendant having passed into the hands of a receiver, the latter was made a defendant, and prosecutes this writ of error, the assignments raising three questions.

[1, 2] It is urged that the plaintiff was itself in default under the contract, in that it failed to pay for the initial shipment; but we think that the payment to the brokers, H. J. Baker & Bro., constituted payment to the defendant. The contract was negotiated by Baker & Bro. The price was based on the units of ammonia, bone phosphate of lime, and potash contained in the tankage, and payment was to be made after its arrival at Norfolk, the delivery point, where it was to be sampled by a chemist, Wiley, whose analysis was made the basis for ascertaining the amount due. The first shipment was received by the plaintiff at Norfolk on August 30, 1919, together with a statement of the number of tons contained therein. Wiley then made his analysis, which was sent by the plaintiff to Baker & Bro., who thereupon, on September 19th, sent the plaintiff an invoice, accompanied by the analysis. The next day, September 20th, the plaintiff sent Baker a check for the full amount of the invoice. No invoice was ever received by the plaintiff from the defendant. The president of the defendant company testified expressly that Baker & Carver were authorized by the defendant to accept payment for this shipment by reason of a trade custom. True it is that this testimony appeared in the evidence offered by the defendant, which had previously moved for a nonsuit on the ground that the plaintiff had failed to prove that Baker & Bro. were the defendant's agent to receive payment. But the mere failure to direct a nonsuit for a lack of proof in the plaintiff's case is not ground for reversing a judgment against the defendant, if by reason of testimony admitted after the refusal of a nonsuit there is ultimately presented a case for a jury. Bostwick, Executor, v. Willett, 72 N. J. Law, 21, 60 Atl. 398.

[3-5] It is further contended that, by reason of an offer made by the defendant to the plaintiff after the breach, the plaintiff was entitled to recover only the value of the credit to which it was entitled under the original contract. That contract required the defendant to make delivery at Norfolk, and, after an analysis had then been made, the plaintiff was to pay. Thus the plaintiff was entitled to a credit from the time the shipment left the defendant's plant at Crab Island, near Atlantic City, until the analysis was made. On November 14, 1919, in reply to the plaintiff's demand for further shipments, the defendant wrote that, as it had not been paid for the first shipment, it considered the contract void, and added: "We are not doing this with the idea of getting better prices, as we will agree to ship under order from you, at the regular price, but being that we have not been paid for our first cargo of the Baird, Jr., and to avoid any controversy in the matter, we will have to insist on its payment, and also an advance payment of all shipments of eight dollars ($8.00) per ton exclusive of freight payment. * * * If this is not satisfactory to you, we will dispose of our tankage to other parties."

The plaintiff in error contends that under the rule laid down in Lawrence v. Porter, 63 Fed. 62, 11 C. C. A. 27, 26 L. R. A. 167, the plaintiff was bound to mitigate its damages by accepting this proposition. But the rule of Lawrence v. Porter does not apply here. In that case there was a contract for the sale of lumber on credit. The seller refused to deliver on credit, but offered to deliver for cash at a reduced price, the reduction more than equaling the interest for the term of credit. The offer was not coupled with any condition operating as an abandon-

ment of the contract, or as a waiver of any right of action for damages for the breach, and it was therefore held that, as the defendant had offered to furnish the identical articles contracted for at a price not greater than the contract price, the plaintiff had suffered no loss. That case, at most, is simply an extension of application of the rule that it is the duty of a buyer, when the seller refuses to deliver the goods contracted for, to do all that he reasonably can to mitigate the loss, and that, if he can supply himself with goods of like kind at the place of delivery or other available market· at the time of breach, for a price not exceeding the contract price, he must do so, the extended application being that this duty of minimizing his loss is not affected by the fact that he can buy only from the party who has breached the contract.

But, of course, to bring an offer within this rule, it must be an unconditional offer, not involving the surrender or waiver of any right that the injured party may have. The distinction is clearly pointed out in Campfield v. Sauer, 189 Fed. 576, 111 C. C. A. 14, 38 L. R. A. (N. S.) 837. That was likewise a case involving a contract for the sale of lumber, where the seller, being in default, wrote to the buyer: "We are perfectly willing to furnish the lumber, provided only you will stand the difference caused by the increase in price since our original agreement, and as per your verbal agreement above mentioned."

In distinguishing that case from Lawrence v. Porter, Judge Knappen said: "It is clear that, had defendant accepted this offer, he would have abandoned all claim for damages for the difference in price so paid. He was under no obligation to make such waiver for the sake of saving plaintiffs from liability for the damages which might result from delay through purchasing elsewhere." And in Hirsch v. Georgia Iron & Coal Co., 169 Fed. 578, 95 C. C. A. 76, Judge Lurton, who wrote the opinion in Lawrence v. Porter, said in referring to the rule under discussion: "The duty imposed by the equitable rule referred to must be held within reasonable bounds. It is a rule which has never been regarded as requiring one to yield to a wrongful demand that he may thereby save the wrongdoer from the legal consequences of his own error."

The defendant's letter of November 14th falls clearly within this exception. It required the plaintiff to regard all controversies as settled, which meant a waiver of the plaintiff's claim for damages for the breach, and required that the amount claimed to be due for the first shipment be paid, whereas in fact it had been paid.

[6, 7] We think that the measure of damages in this case was clearly the usual measure of the difference between the contract price and the market price at the place of delivery and time of breach. The final contention of the plaintiff in error is that, even if this be true, nevertheless the plaintiff failed to adequately prove such market price. The contract contained the following provision as to price: "Price: $3.25 per unit of ammonia, 10c per unit of bone phosphate of lime, and $1.00 per unit of potash per ton of 2,000 lbs. delivered Norfolk, Va., in bulk."

The contract price of the initial shipment of 293½ tons, based on Wiley's analysis of that shipment, was $13.43 per ton. The plaintiff proved by a competent witness, who has had 20 years' experience in the manufacture, purchase, and sale of garbage tankage of the kind mentioned in the contract, that in November, 1919, the price per unit of ammonia was about $6.03 delivered at Norfolk, 10 cents per unit for bone phosphate of lime, and $1 per unit for potash, and that, based on the analysis of the only shipment made by the defendant, just referred to, the further shipments to which the plaintiff was entitled would have been worth $24.01 per ton delivered at Norfolk. This witness testified that his valuation was calculated on the basis of the value of material at the point of production, plus freight to Norfolk, and that he had selected Detroit as the point of production, because it is the central point of shipment. He further testified that, if shipments had been made from Philadelphia or other points nearer to Norfolk, the price per unit in Norfolk would not have been less by reason of that fact, since a seller, shipping from Philadelphia or other nearer point, would have received a higher price.

The brief of the learned counsel for the plaintiff in error misapprehends the testimony on this point. We think· that the testimony referred to was sufficient to justify a finding by the jury that the market price at the place of delivery at the time of breach was $24.01 per ton. It is true that the number of units of ammonia, bone phosphate of lime, and potash in garbage tankage varies to some extent, and upon this fact the plaintiff in error bases a contention that it was incumbent on the plaintiff to perform the impossible task of proving how many units of these ingredients would ac-

tually have been contained in the tankage that the defendant failed to deliver, if it had in fact delivered it. But the proof clearly fulfilled the requisite measure of certainty.

Judgment affirmed.